161489 U.S. v. Damian Corbett That issue is the court's re-instruction to the jury of an abbreviation of the general asking whether the defendant's expression to a government agent, a then government agent, that he intended to pick up opanas, drugs, from that agent, was within the scope of the indictment as charged. And that was the question they had. Is that action within the scope of the indictment as charged? So why is this not classic waiver? When the attorney, when the judge kept saying he wasn't wedded to it and the attorney said, I think it restates the instruction already given, so I have no problem with it. I suggest to the court that a waiver must be intentional. And I suggest what occurred... That doesn't sound intentional? What I suggest would occur was nothing more than acquiescence to the court's instruction. And no different than when counsel acquiesce to the instructions given following and doesn't make an objection. But he was given an opportunity to suggest different language and suggest a different instruction. That is, you know, you have to understand him. First, he objected and made an objection saying, no, this doesn't fall within. And then he said simply that because the court is giving at least the conspiracy instruction, I guess, you know, more or less, I guess it's okay. He did not suggest something different, but it doesn't necessarily fall in the defense to do that. It falls in the court to properly instruct, particularly when it comes to the conspiracy issue. And I think one of the most important things here is the government's brief itself points to the problem. Because what occurred is by failing to give the entire instruction, it allowed the jury to find a conspiracy that wasn't charged. For example, Can you just go back one step on the waiver point? Sure. So just so I get the sequence of events. Defense counsel objects to the proposed answer? He objected to or simply said in response to the court's question, no, that can't fall within the scope of the conspiracy. And then the court went on and talked about what is the government's argument, what is defense's argument. And what's defense say? And the defense didn't respond to anything at that point. Simply when the court came back with the suggestion that it would give the abbreviated conspiracy instruction. Defense counsel says what? Yes, that's part of the conspiracy. That's the general conspiracy instruction. That's okay. He said I have no problem with it. How is the district court supposed to know that there's an objection then? He first proposes, the first time out of the box, defense counsel raises a problem. They have a back and forth. District court then proposes a solution. And defense counsel says I have no problem with that. I just don't see what's. Well, that is no different than not making an objection. It's totally different. Well, I suggest because he said I have no problem with what you just did. Not objecting, maybe I'm asleep, I'm not thinking, it's terrible but I'm a terrible lawyer. There's a big difference between forfeiture and waiver. And I'm trying. So if we found forfeiture, we could at least review it for plain error. Which is high enough as a standard. That's true. But if it's a classic waiver, we don't even look at it. That's correct. But look at the cases that even the government cited. The Acosta, the Christie, the Wall. And only Wall was a case involving a direct instruction. The Acosta case and the Christie case were public trial cases. At the heart of this problem, and I know you've got other arguments that you want to make, but at the heart of this problem is what Judge Barron just brought up. I mean, the point is that defense counsel, if they have an objection, objects so that the district court can have an opportunity to correct it. But the concern is that the defendant is convicted on erroneous instruction of the law. But just to make it stronger. Suppose the defense counsel says your solution is great, Judge. That's wavering. That, I suggest, would be an intentional wavering. Okay. Silence is not. That's a great solution, Judge, it is. I have no problem with that. You're saying we should treat it like silence. I suggest that that is more akin to silence. Particularly where it's such an important issue in this case. And if I just follow through for a second. If you look at page 47 of the government's brief, and we're there, they suggest that after the court's instruction, one can infer that Corbin had alternative persons unknown to the grand jury or Gillis to whom he planned to distribute. Something entirely uncharged in the indictment, unproven by the evidence, during the arguments of the prosecution at the time of the closing arguments, they were very careful to say, Mr. Corbin is the supplier to Gillis and to Garish. Well, there was evidence of that. They justified that he was. It's not that there was no evidence. That was what the evidence was. That's what the conspiracy was. Yet the government is suggesting, well, following the court's instruction, they could have found any conspiracy. He was intending to distribute to somebody else, not to charge conspiracy. And that's exactly what the jury could have done. And that's the problem. And unless the court had said, which if the court had given the complete instruction, and the complete instruction would have included that the government must prove the conspiracy charged in the indictment and the government not that some other conspiracy existed. If the court had agreed with that, then the jury would have had a more complete answer to their inquiry. By having only a partial inquiry, it allowed them to speculate. And that is the concern that I suggest goes to the level of the fairness of the proceeding. I don't want to take you off your course. Is there an issue here where there was a buyer-seller relationship rather than a conspiracy? That was the argument that was made by defense counsel. But that couldn't be an answer to the jury's question. No, I'm not asking you what. I'm just asking whether that still is an argument in this case. Well, that was certainly for the issue of sufficiency of the evidence, the first issue that was presented. The court could look at it that way. And that was the argument raised by defense counsel. But whether focusing on the conspiracy, it goes to a different question. Can I go just on the instruction issue? So maybe I'm now getting what you're saying better than I did before. The objection was initially for the judge to do something that would make clear that insofar as she was acting as an agent, that could not be the ground for the conspiracy. But then the solution created a new problem, which was by only half describing the prior conspiracy charge, it suggested that some other conspiracy could be made. And so the idea is he didn't object to that aspect of it. Correct. And in that sense, you want to treat it as if it's just a waiver. So he was happy that there was a solution to the problem, whether she was an agent, but wasn't thinking through whether in solving that problem it created a new one. Is that the basic idea? That is correct. And it's particularly focusing on what the juror's question was, does this fall within the scope of the conspiracy? And as I said, even the government themselves are arguing it could have been a conspiracy with anyone. And that gives us all grave concern that someone is being convicted of something that they were not charged with. Did these jurors have the written instructions in the jury room with them? I don't know if that is the practice or procedure in Maine. It is the practice and procedure in most of Massachusetts courtrooms, but I cannot say for sure. But they had earlier been instructed correctly on conspiracy. That is correct. Thank you. Thank you very much, Your Honor. Good morning. May it please the Court, Rene Bunker on behalf of the United States. It is the practice for the jury instructions to go back to the jury in our district as well. This, Judge Thompson, hit the first issue. This is a classic waiver. The district court repeated twice that it was not wedded in any regard or respect to its proposed response to this question. It proposed it orally and that typed it up. The defense gave counsel a second opportunity to review and consider its proposed response. And what did defense counsel say? I think it restates the instruction already given, so I have no problem. The case law we cite, that is a classic waiver. If that's not, I'm not sure what is. But Judge Barron just told you what is. It's a great instruction. It really is. Had the defense attorney said something even stronger? But I don't know that that would have given the district judge not only a sense that there's no objection, but a sense that the defense, both parties, in fact, completely agreed with the court's proposal. Which we submit was correct. And I think that Mr. Corbett has somewhat stretched or maybe narrowed the scope of the government's various arguments. The case law is clear that a yes answer to that question by the jury, inartfully posed perhaps, would have meant that yes, as Manuel Santiago, Ortiz, Islas, Fanfan, Mimi, these types of post-conspiracy operations are not atypical at all. And the evidence that comes from them, be that in the defendant's own statements or in conversations like what occurred here, was absolutely compelling evidence of Mr. Corbett's earlier agreement to distribute oxycodone and here the opanas as well. And the evidence supported that inference because Ms. Gillis testified that, quote, when asked about the opana part of this, and this was mostly an oxycodone conspiracy and there was overwhelming evidence of that piece. But asked about how the opanas came about, she said, Corbett, quote, told me I would be able to make more profit off the opanas. Quote, so I agreed to see if I could sell them. That's at page 127 of the defendant's appendix. So it would obviously make sense as the court, as the colloquy went with both counsel, that part and parcel to that was that if Gillis, she had agreed, and he fronted the pills to her, I mean with that, and if she had agreed to try to sell them and could not, it would certainly be, a reasonable inference could be made that part of that conspiracy was that Mr. Corbett, the prolific pill pusher, would recover and retrieve his product or go, or lose the prospective drug proceeds. So again, those cases, Manuel, Santiago, Ortiz, Eastloss, Fanfan, Mimi, they all support what happened here. And I submit that the evidence regarding the opana discussion is as ripe and as appropriate for the jury to have considered with regard to the charged conspiracy, as was the very compelling discussion about the money that Gillis owed Mr. Corbett. She said, I have the, it said page, you'll go listen to the CD, page 16 of the transcript. Page 16 of our appendix is where the transcript is. And Gillis says, what is it I owe you again? Corbett, $26.50. Gillis, $26.50? I thought it was $25.60 for some reason. Corbett, I have to think. It might be. And then when she testified, she handed him the $25.60. And he said, all right, and accepted the drug proceeds from his pill distributor. That's, there's no problem with that, we all agree. That would go to showing an earlier agreement between Mr. Corbett and Ms. Gillis to distribute pills. And he, we had testimony from Ms. Gillis, and he fronted the pills to her. And this was evidence of that earlier agreement that she had then sold the pills, and she testified all about this, and was returning, the whole point of the meeting was to return drug proceeds, what he thought would be drug proceeds, which was the marked money that the agents had given her. That's, that's not, the appropriateness of considering that is not challenged at all. And we submit that the same is so for the conversation about the appendix. It's corroboration to the testimony by Gillis, and Garrish somewhat, and it's also evidence of his agreement, his earlier agreement before Gillis and Garrish were arrested on December 16. Excuse me, I've been wanting to ask you something, and that is, according to the government, who were the members of the conspiracy charge? The, well the only one charged here was Mr. Corbett and others unknown to the grand jury. The ones that we know, through the trial testimony, the jury would have known, as, well they're not named in this case, but they, they agreed, they were pleading guilty pursuant to pleading cooperation agreements, were Gillis and Garrish. And to the extent that, going to my opponent's argument, yes, to the extent the jury wanted to reasonably infer that Corbett wasn't manufacturing these drugs, he was getting them from someone, there may have been other players, but the ones that were discussed at trial were really focused on Corbett and Ms. Gillis and Mr. Garrish. And is there any evidence of a buyer-seller relationship here? No, Your Honor, I don't think the evidence supports that at all, and it's not raised on appeal. The buyer-seller relationship would have been Garrish's customers, perhaps, some were buying in larger quantities that might call that even into question, and perhaps Gillis's other lower customers, but I don't think this evidence supports that at all. It was a repeat, it was a two-year conspiracy that Gillis and Garrish talked about, beginning in about mid-2012, lasting for two years, regarding mostly oxycodones, a small quantity of suboxones, and just in the last two months was the Apanas. So I think the testimony from Garrish and Gillis that Corbett was making deliveries at least about on a monthly basis during that two-year period, he began distributing to Gillis 50 to 100 Percocets, those Perc-30s are the oxycodone, and then apparently the business was doing well on main addicts, and he then upped the amounts to 150 to 300 pills, oxycodones, per transaction, be they monthly or more than monthly, and then on one occasion he supplied, according to Gillis's testimony, as many as 500 oxycodone pills per transaction. So I think the duration and the volume and the long-term relationship regarding the pill distribution would undermine any buyer-seller relationship. I don't understand why it would undermine it. I mean, can't you have a buyer-seller relationship over a period of time? The case, I haven't even read those cases because it really wasn't, it's not raised on appeals, it hasn't been an issue, and it wasn't a strong, it was a, the theory of the defense was that Corbett was a user and never joined this conspiracy to the extent, if the jury believed that, they did not know that might be a buyer-seller relationship. He was buying the pills from Gillis and Garish as a user. That certainly, had the jury believed it, would fit, based on my understanding of the buyer-seller case law, be a stronger argument for that theory of defense. But again, that wasn't raised here, and I haven't reread those cases for that reason. Well, your best argument is that he was fronting the money, right? I mean, fronting the pills and waiting to be paid, which means that he had an interest in the success of the whole criminal enterprise. Yes, he fronted her from start to finish, from what it sounds like, and in fact, it sounds like she never would have been able to, this goes to the use of a minor enhancement, but yeah, he solicited her to come into the pill business, and he fronted her with the oxycodone pills and then the opanas, and he collected her drug proceeds over the course of time, and they were by no means equal partners, which I think is another argument the appellant has raised. On this evidence, that conclusion just can't be drawn from this evidence that they were equal partners. He decided the amounts. He decided the timing of the deliveries. He decided the price. Could you just quickly address the enhancement that was applied for the minor? Sure. The defendant never, below or on appeal, challenged the fact that she was a minor at various points during the drug distribution. The evidence showed that Corbett met Gillis on Facebook when she was just 13 years old, that he then, the district court supportably found, used her little marijuana test, gave her $100 and asked her when they first met in person, still as a young minor, still as a young teenager, he asked her to get marijuana for him. By the time she got back to the New Hampshire location, he had taken off and said, oh, you keep it, a grooming gift, one could infer. Then there was the alcohol incident in 2009 where he brought alcohol to a party, quickly dropped it off, she was still a minor. Again, the court reasonably inferred a grooming process. And then their conversation turned to pill distribution, and Corbett initially asked if Gillis could get some pills for him, Garish did, and then the relationship quickly thereafter turned to Corbett sharing that he could get pills for her and Garish to distribute, and the rest is history. She, of course, went down that path. She also reported that Corbett had sex with her when she was a minor, and although Corbett said he waited until she turned 18 to go down that path, again, the district court, the trial judge, was clearly not finding Mr. Corbett particularly credible at sentencing. So that was some of the evidence that supported the answer. With that, we have something to affirm. Thank you.